NORTON *v.* NORTON

5-1163 302 S. W. 2d 78

Opinion delivered May 6, 1957.

[Rehearing denied June 10, 1957]

*Dinning & Dinning,* for appellant.

*D. S. Heslep,* for appellee.

J. SEABORN HOLT, Associate Justice. This litigation involves the validity of two deeds. Appellant, Mary G. Norton, a widow, and the mother of Richard D. Norton, appellee, and four other sons, on June 18, 1955, executed and delivered two deeds to her son, Richard, in one of which she conveyed to him 480 acres of farm land in Phillips County for consideration of $7,000 and other valuable consideration, and described as follows: "Northeast Quarter (NE ¼) of Section Eleven (11) and the North Half (N ½) of Section Twelve (12) all in Town-

ship Two (2) South, Range One (1) East, containing 480 acres more or less," and in the other she conveyed town property (residence) in Marvell, Arkansas, for a consideration of $1,000 and other valuable consideration and described as follows: "One Hundred Twenty Two and one-half (122 ½) Feet off of the West End of Lots Number One (1), Two (2), and Three (3) of Mayo's Subdivision of the Town of Marvell, Arkansas." In both deeds she reserved a life estate.

On September 22, 1955, Mrs. Norton filed suit against her son Richard and wife, (residents of Jackson, Tennessee) to cancel and set aside the two deeds on the grounds that they were fraudulently obtained from her through intimidation and false representation; that no part of the consideration named in each of the deeds was ever paid, and was grossly inadequate. On October 20, 1955, Richard, by his then attorney,—who later withdrew from the case,—answered with a general denial. With the issues thus joined, trial was begun February 21, 1956. Mrs. Norton testified at length. Her testimony on direct and cross-examination covered some 54 pages of the record. At the close of her testimony and after a thorough cross-examination by Richard's then attorney, Mrs. Norton rested her case and Richard's then attorney asked permission to withdraw from the case, since he felt that he should become a witness. This permission was granted and an adjournment was taken until February 28, 1956. At the conclusion of the trial, at which the attorney, over appellant's objections, was permitted to become a witness and testify on behalf of appellee, Richard, there was a decree in favor of appellees, and this appeal followed.

For reversal appellant contended that "1. The testimony of the attorney was privileged and inadmissible for any purpose for the reason that he was then, and had been for ten years, the regular attorney of the appellant (Mrs. Norton). 2. The burden of proof under the facts in this case rested upon the defendant and this was overlooked by the Chancellor in making his finding of law that the burden rested upon the plaintiff to prove by clear, cogent and convincing testimony that fraud or un-

due influence was exercised in procuring the execution of the deeds. 3. The clear preponderance of the competent testimony in this case rests with the appellant and the court erred in basing his decision upon testimony that was clearly incompetent.''

Mrs. Norton, as indicated, is the mother of five sons including appellee, Richard. It appears undisputed that neither of the sums named in the two deeds was ever paid by Richard. The Chancellor found, and we think the testimony supports this finding, that the 480 acre farm conveyed in one of the deeds was worth $75,000 and the town property $15,000. It was appellant's primary contention that when she signed the two deeds she thought she was signing a will. Her testimony was to the following effect: She testified that before the instruments were executed she sold a few acres of land adjoining the 480 acre tract with the idea of building a home in Marvell. That Richard, who lived in Jackson, Tennessee and was an experienced contractor, volunteered to build the house for her without any charge for his services and that she paid for the cost of material and labor used in building the house, which amounted in the aggregate to $12,271.68. That she had a savings account of $3,000 in Helena, a checking account of some $1,000 to $2,000, and in a building account $10,000, or a little more. At the time she was suffering with cancer and needed medical and hospital care. Richard told her he loved her and realized that she was sick and was giving his services that she might be taken care of in her old age. Richard partly built the house, spent the $12,000 for labor and materials. In building the house Richard charged her with items that he promised to give her, and at the end, in order to keep him from losing she told him she would make a will and that it would be prepared in the office of her attorney. I told him, ''At my death you will get the house, but I want the rest of my property to be equally divided with the rest of the boys.'' He told her that the other boys wanted to take over the property and send her to the insane asylum, ''I think the thing for you to do, Mama, is just turn the property over to me and I will take care of you

as long as you live.'' I said, ''No, I will have to investigate that and find out about it, I will go in and see Mr. Cracraft about it.'' The firm represented me at that time. She was so ill, she forgot all about it. She further testified that the only thing she undertook to do was to make a will for Richard covering the house, which he had helped her to build. Sometime in September or October she went with Richard to Florida to see her brother and when she returned home she found for the first time, that she had executed deeds conveying all the property, that she thought it was her will when she signed the deeds. That these two deeds had been prepared by Richard's attorney of Jackson, Tennessee; that Richard, in company with his attorney, brought the deeds to Marvell for Mrs. Norton's signature. She suggested that the instruments be executed in the office of her attorneys, who had represented her for some ten years. That at the time she signed the two instruments she inquired of Richard why there were two and he informed her that one of them was for her and the other one for him; that it was a will and one was a copy of the other, and she believed what he told her to be true. She did not read them. She signed the two instruments in the presence of her attorney who took her acknowledgment.

Following their return from Florida and as she was leaving Richard's home to return to Marvell, he (Richard) followed her to the car and told her he wanted to buy the farm, and that she replied, ''Richard, I have told you and told your wife, Carolyn, that I would never sell that farm as long as I live. That is my security.'' He put his arm around her and said, ''I am your security, honey.'' I replied, ''You can't talk to me about the farm.'' He said, ''It won't hurt if I talk to the other boys about it,'' and I replied, ''You can talk to the other boys about it after my death.'' At that time she didn't realize that she had signed deeds conveying to him the property, which stripped her of everything in the world she had, and left her without means to secure hospital and medical treatment. That she had been going to a hospital in Little Rock, but that her son, Earl, who

lives in Marvell has been bearing all the expenses, along with a son, Gaines, who lives in Little Rock. That she was so ill she did not recall the date when the house was finished but following its completion and after she learned that she had executed the deeds and not a will (as she intended) she telephoned Richard and asked to see him, that she had cancer and had to go to a hospital in Little Rock, but that he replied that he didn't have time to fool with her. From the time he got the deeds and since the completion of the house he has never been to see her.

Her son, Earl, testified that Richard did not put any money in the house, that he (Earl) was not present when the instruments were signed in the attorney's office. ''I didn't know that she was signing any deeds, I knew that she was going to fix a will for Richard to get the house.''

Richard testified at length in his own behalf. He positively denied the material parts of his mother's testimony and brazenly asserted in his testimony that she had testified falsely on material matters. We think the testimony of this son, who, in trying to hold fast to an alleged gift of some $90,000 worth of property, for which he paid nothing, and who testified, in effect, that he did not believe his own mother on oath, shows a great disregard of the filial love and respect a child should have, and tends to discredit him.

Richard's wife, Carolyn, one of the appellees and vitally interested, testified that Mrs. Norton was with her, Richard, their two children, and a friend on a trip to Florida, and that Mrs. Norton on several occasions on the trip stated that she wanted Richard to have all the property including the farm. That one of these statements was made in the presence of Mrs. Norton's brother, D. F. Gaines, in whose home Mrs. Norton visited during their stay in Florida. Mr. Gaines (a retired businessman) tended to contradict this testimony of Richard's wife. ''. . . it was the first time I had seen my sister in several years and her statements were that her money had paid for the labor and materials for the

new house and that she intended to will this home to Richard after her death but never was any statement made by her that she had deeded it or would deed it to him.''

We consider now the testimony of the above attorney, which the trial court admitted, over the objections of appellants, as proper, and which it appears largely influenced the court's findings and decree. Its findings contained this recital: ''The court has reached the conclusion that if the testimony of Mr. Cracraft is accepted as being true then there can be no question but that at the time of the execution of the instruments Mrs. Norton knew what she was doing and that her acts in so doing were done freely and without any compulsion or undue influence or under any misapprehension as to the effect of her acts. The sympathy of the court is with the plaintiff and it has a deep regret that it cannot find some legal means by which the relief sought by plaintiff can . . . be granted. There is no question that she now regrets the execution and delivery of these deeds by which she deprives herself and her other sons of any hope on inheritance to the fee in this property. Certainly the defendant and his wife have not filled the offices of devoted children toward the mother in her time of trouble and terrible sickness, but the court is not able to find that plaintiff has met the burden the law places on her to cancel the deeds in this action.''

The attorney had testified, in effect, that he took Mrs. Norton into his private office, took her acknowledgment and gave her advice as to the nature and effect of the instruments, and further testified as to what Mrs. Norton told him during this conference. The firm, of which this attorney, Cracraft, is now a member (before he became a member) had probated the will of Mrs. Norton's late husband, secured the appointment of an executrix, and, as indicated, had represented her as her attorney for some 10 years. We emphasize that Mr. Cracraft at all times acted in a fine and upright manner, and nothing herein is a reflection on him in any way. We have concluded, however, in the circumstances that the testimony of the said attorney was in the na-

ture of privileged communication between attorney and client and should not have been admitted in evidence. § 28-601 Ark. Stats. 1947 provides: "The following persons shall be imcompetent to testify: * * * An attorney, concerning any communication made to him by his client in that relation, or his advice thereon, without the client's consent." "The rule as to privileged communications between attorney and client extends to statements of each to the other. It is not material whether the evidence relates to what was said by the attorney, or what was said by the client, in their private conversation on the business in which the attorney is professionally employed," 58 American Jurisprudence, § 483, p. 270. The Circuit Court of Appeals, the 9th Circuit, in the case of *Baldwin* v. *Commissioner of Internal Revenue,* 125 F 2d 812, 141 A. L. R. 548, wherein it was insisted that a deed in question had been executed for publicity and that there was no confidential relationship existing between the attorney and client, the court said: "But this argument overlooks the true nature of attorney Cosgrave's testimony. His testimony, and the testimony on which the Board based its decision, was as to the *legal reasons* for the execution of the deeds. He testified that he had advised the mother to deed the property rather than leave it by will and thus avoid probate expenses. It is our opinion and we hold that it was error for the Board to admit the testimony of Cosgrave concerning the exchange of deeds between the mother and the son. Without the attorney's testimony there is no testimony in support of the Board's decision that the transfer was one intended to take effect in possession or enjoyment at or after death, nor is there evidence to support a finding that it was in contemplation of death."

When all the competent testimony in this record is considered, we hold that appellee has failed to meet the burden of proof required, in the circumstances, in the present case, which is between the mother and son, where the most intimate and confidential relationship existed, where there was no money consideration and nothing more than a gift was intended by the instruments in question. The duty rested on appellee, Richard, to show

that these instruments were freely and voluntarily executed. Our oft repeated rule running through our decisions is stated in *Young* v. *Barde,* 194 Ark. 416, 108 S. W. 2d 495, in this language: "The general rule is that where special trust and confidence exists between the parties to a deed, the gift to the party holding the dominant position is *prima facie* void. In *Gillespie* v. *Holland,* 40 Ark. 28, 48 Am. Rep. 1, cited by appellees, the court announces the doctrine from which there has been no deviation, as follows: 'It has been the well-established doctrine in equity that contracts, and most especially gifts, will be scrutinized with the most jealous care when made between parties who occupy such confidential relation as to make it the duty of the person benefited by the contract or bounty, to guard and protect the interests of the other and give such advice as would promote those interests. And this is not confined to cases where there is a legal control . . . They are supposed to arise wherever there is a relation of dependence or confidence, especially that most unquestioning of all confidences which springs from affection on one side and a trust in a reciprocal affection on the other. The cases for the application of the doctrine can not be scheduled. They pervade all social and domestic life. The application may sometimes be harsh, and one might well wish that an exception could be made, but there is a higher policy which demands that it should be universal. The language of Lord Kingsdowne, in *Smith* v. *Kay,* 7 H. of Lords Cases 750, has been considered striking. He says that relief in equity will always be afforded against transactions in which 'influence has been acquired and abused, in which confidence has been reposed and betrayed'."

Accordingly, the decree is reversed and the cause remanded with directions for further proceedings consistent with this opinion.

Chief Justice HARRIS and Mr. Justice WARD concur.

PAUL WARD, Associate Justice (concurring). I concur in the result reached by the majority, but I think the reason

on which that result rests is wrong, or at least very misleading.

At the beginning of the next to the last paragraph in the opinion this language is found: "When all the competent testimony in this record is considered, we hold that appellee has failed to meet the burden of proof required, in the circumstances, in the present case, which is between the mother and son, . . ."

I am at a loss to understand (for the opinion does not explain) just at what point in the trial of the case the burden shifted to appellee. Does the majority mean to say or imply that the burden shifted from the plaintiff (appellant) to the defendant (appellee) when the relationship of mother and son was shown? Frankly, I can think of no other testimony that could remotely tend to shift the burden. If it is meant that the showing of the mother and son relationship cast the burden of proof on appellee, then I submit that there is a grave possibility that thousands of similar transactions in this state are in jeopardy. It is common knowledge that quite frequently a parent will deed property to a child, or vice versa. It has never been my understanding that such a transaction cast a cloud of suspicion on the grantee which he might some day be called upon to explain away.

And how can the burden of explaining away the cloud be met? The majority opinion sheds some interesting light on that point, for it says: "The duty rested on appellee, Richard, to show that these instruments were freely and voluntarily executed." This poses a novel situation, for how can a grantee be expected to make positive proof that his grantor acted "freely and voluntarily."

I feel that those making the majority opinion have misapplied the rule they rely on. In this case there is no showing of any special confidential relationship existing between the parties other than parental, and it is not shown that any positive duty rested on the son to advise his mother. To the contrary, the mother

actively sought and obtained the advice of a law firm of her own choosing.

The time honored rule is that the burden rests on the one seeking to set aside a deed, and I think it would be much safer to apply it here, especially where it can be done and reach the same result.

HARRIS, C. J., joins in this concurrence.