BARRINEAU *v.* BROWN

5-3770                                    401 S. W. 2d 30

Opinion delivered April 4, 1966

*Smith, Williams, Friday & Bowen,* By: *William H. Bowen* and *Byron H. Eiseman, Jr.,* for appellant.

*Moses, McClellan, Arnold, Owen & McDermott, Milton H. McLees, E. H. Herrod, Catlett & Henderson,* for appellee.

FRANK HOLT, Justice. By a declaratory judgment proceeding the appellant seeks to invalidate approximately $60,000.00 in gifts *inter vivos* allegedly made by Oddie M. Anderson, deceased, to the appellees. From a decree in favor of appellees comes this appeal.

For reversal appellant first contends that the evidence is insufficient to support the chancellor's finding of fact that the appellees have by "clear and convincing

evidence established that the gifts were valid and did not result from the violation of a confidential relationship.'' Appellees do not dispute the existence of a confidential relationship. They accept the burden of proof that is required to overcome the presumption of invalidity of a gift when it stems from such a relationship. They assert that the gifts to them were not the product of a confidence betrayed or influence abused and, therefore, are valid gifts.

The appellant, a niece, is the closest living relative and principal beneficiary in the decedent's will which contained numerous bequests including some to appellees. Each of the appellees was a close friend of the decedent for more than thirty years preceding her death. Appellee Brown, a stockbroker, had known Mrs. Anderson since the early 1930's during which time he had sold her securities and advised her on the sale and purchase of securities. Sometimes she followed his recommendations and sometimes she rejected them. Appellee Loftin, a lawyer, performed some of the legal services she required during the thirty-three years he knew her as a close friend and never charged her for his services. These legal services appear to be trivial other than revising her will. Appellee Eastwood, 78 years of age, had been a close friend of Mrs. Anderson's for about fifty years. When they became widows, many years ago, their friendship became closer and Mrs. Eastwood would often come from Warren to Little Rock to visit Mrs. Anderson in her home. Sometimes this visit would extend for a period of two or three weeks during which time they engaged in various social activities.

In November 1961 Mrs. Eastwood and Loftin were given a general power of attorney by Mrs. Anderson and each was properly authorized by her to have access to her safety deposit box in a local bank. In 1963 Mrs. Anderson gave Mrs. Eastwood $5,000.00 in stock as a Christmas present.

The gifts now in question were made by the de-

cedent to the appellees on March 4, 1964 according to their evidence. The gifts were unexpected. Mrs. Eastwood had come to Little Rock for a visit at the written request of the decedent. On the evening of March 2, 1964 one of Mrs. Anderson's nurses called appellee Brown and told him that Mrs. Anderson wanted to see him the following morning. When he arrived about 8:30 A.M. he found Mrs. Eastwood there. Appellee Loftin arrived shortly thereafter in response to a telephone call from Mrs. Anderson. Without knowing why their presence was desired, they waited while the nurse served Mrs. Anderson's breakfast since she was bedfast. She summoned them into her room and said she was sure they were wondering what she wanted to see them about. She then told them that it was her desire to give her Arkansas Power and Light Company stock to Mrs. Eastwood and that she wanted Loftin and Brown to have other securities. She then directed Mrs. Eastwood and Brown to take the key to her safety deposit box and get these securities for her. They complied and left in the box a note signed by each of them designating the securities they were taking and by what authority. Appellee Loftin remained at the residence and during this time he inquired of her if she knew what she was doing. When appellees Brown and Eastwood returned he gave Mrs. Anderson three parcels, one containing the Arkansas Power and Light Company stock valued at $17,-000.00, one containing $21,000.00 in bonds, and another containing $22,000.00 in bonds. When Mrs. Anderson heard her sister-in-law, Mrs. Risor, in the house she asked them to leave and come back the next morning. Appellee Brown took the three parcels with him and locked them in his office that night. The next morning, on March 4th, the appellees again met at Mrs. Anderson's house. Appellee Loftin asked: "Now, Oddie, is this what you want? *** Have you made up your mind? Do you know what you are doing?" To which Mrs. Anderson again reiterated that it was her wish to make these gifts to them. Upon delivery of the gifts, Mrs. Anderson was quoted as saying: "I want you to take them, get out, and I don't want to hear another word from you or anyone

else about it.'' Mrs. Anderson signed the Arkansas Power and Light Company certificates. A transfer of the other securities did not require her signature.

The appellant argues that the decedent's age, partial paralysis, faulty vision and invalid condition when combined with appellees' confidential relationship, the secrecy and size of the alleged gifts which are greatly in excess of the small bequests made to the appellees in her will require a finding that the gifts were not free and voluntary and, therefore, they are void. The gifts total approximately 37½% of the estate.

It appears that Mrs. Anderson was 86 years of age. For about two years before her death Mrs. Anderson knew that she suffered from an inoperable and incurable degenerative process in the spinal cord probably due to softening from arteriosclerotic disease. This affected her ability to walk and at the time of the alleged gifts her lower extremities and left side were paralyzed. In December 1962 and January 1963 she spent 41 days in the hospital suffering from vertigo, a speech impairment, and inability to walk. About September 1963 she again was a hospital patient for about 15 days suffering from a cerebral vascular accident or stroke. On March 4, 1964, the date of the alleged gifts, she was bedfast and being partially paralyzed, required the constant attendance of a nurse. On May 28, 1964 she was taken to the hospital suffering from pneumonia and she died there the following October.

To corroborate their version of the validity of the gifts the appellees presented numerous disinterested witnesses. Lewis Block, Sr., a local realtor who had done business with Mrs. Anderson for approximately 35 years, was in her home on the same day the gifts were made. He was there at her request to discuss the sale of some of her property. According to him Mrs. Anderson's mind was as keen as ever and she demonstrated her usual good business judgment. Mr. Block testified: ''Q. Did she tell you anything about her having made

a disposition of some of her property recently? A. She did on the 4th of March. She said she had distributed, I believe is the word she used, some securities." On that day he also observed the presence of the appellees. She asked him to secure certain information for her about the advisability of selling the property they were discussing. He complied and when he conferred with her a few days later she decided to reject the purchase offer.

Perhaps a Mrs. Cleveland was in a better position than anyone to testify concerning the matters involved in this case. She was a nurse in Mrs. Anderson's home from August 1963 until Mrs. Anderson entered the hospital in May 1964 for her terminal illness. She was the nurse on duty at the time of the questioned gifts. She testified that Mrs. Anderson was mentally alert, could read to some extent, watched television, remembered telephone numbers and wrote her property ads. According to her the decedent held the Loftins in deep affection, "just dearly loved them," and they were attentive to her personal needs. On the day of the alleged gifts Mrs. Anderson asked her to hurry and get her ready because she had asked the appellees to come to her house. Mrs. Anderson told her: "I planned on giving each of them a thousand dollars" but "Tiny, since I thought it over, they have done so much for me that would not be a drop in the bucket as far as what I really owe to them in gratitude." Mrs. Anderson told her: "I am going to give them more than that." But she never told her the amount. The nurse left the room after the appellees came in. After they left Mrs. Anderson told her: "It is the happiest moment of my life" and she cautioned her not to disclose her actions.

Mrs. Rockenbach, a cousin of Mrs. Anderson, testified that she had enjoyed a close relationship for many years with her, visiting with her at least twice a week after she became confined to her home. She said that her cousin had a very commanding personality and was a very resolute person; that Mrs. Anderson had given her small gifts through the years and in December 1963

she unexpectedly gave her and her husband two $1,000.00 bonds. According to her, Mrs. Anderson was mentally alert and not susceptible to being overreached. She testified that the appellees were very close friends of Mrs. Anderson and very attentive to her.

Mrs. Anderson's cousin, Judge Nunn of the Fifth Judicial Circuit, Texarkana, Texas, testified that he was in her home the last of February or first of March and found her as rational and mentally alert as she had been through the years. He described her as follows: "She was a very strong-willed woman. *** I don't know anyone that could dominate her. When she made up her mind, that was it." His mother testified that she was in Mrs. Anderson's home in the spring of 1964 and that she observed no difference in her usual mental ability. She described Mrs. Anderson as a self-willed woman who knew and managed her own affairs.

Others testifying included members of a prayer group in Mrs. Anderson's church where she had been a member for many years. They visited Mrs. Anderson each month and found her very alert and knowledgeable in her conversations. They described Mrs. Anderson as one who had "a very strong mind of her own" who could not be easily influenced.

Mrs. Mays, who attended Mrs. Anderson as a practical nurse, cook and housekeeper, testified that Mrs. Anderson kept herself current on affairs, watched television and that her health seemed better in 1964 than in 1963. About the date of the questioned gifts, Mrs. Anderson told her: "Well, I have done something that made me happier than I have ever been. I have made a number of my friends happy." However, she did not disclose to her what she had done.

A doctor testified that he had known Mrs. Anderson as a patient since 1956. He saw her about two months following the date of the gifts at which time he was impressed by her usual mental acuity. He described

her as a dominant, driving personality whose soundness of mind was remarkable for a woman her age.

To establish the invalidity of the gifts the appellant testified that she lived in Dallas, Texas and tried to visit her aunt regularly each month in addition to the holidays and when she was critically ill; that her mother, Mrs. Risor, was very attentive to Mrs. Anderson; that her aunt could hardly sign checks because of her physical condition; that she was told by her aunt about the $2,000.00 gifts to the Rockenbachs in December 1963, however, she had no knowledge of the questioned gifts until after her aunt's demise and that these gifts were contrary to her aunt's wishes; that her aunt established a joint bank account of approximately $2,-000.00 in their names in May 1964; that the appellees were among her aunt's closest friends; that she knew of no abuse of her aunt's confidence by appellees Eastwood and Brown; that appellee Loftin had unsuccessfully urged her aunt to sell some property; that her aunt was "a strong-willed woman" and when asked if this changed in the last few months before she entered the hospital in May 1964, she responded "somewhat" and that she was not as active as she once was, "I would say she was not as strong-willed as she had been before but usually she still pretty well knew what she wanted and what she wanted done."

In support of her version the appellant presented several witnesses. Mrs. Robbins, who had lived as a neighbor to Mrs. Anderson for 15 years, testified that she was in almost daily contact with her. According to her Mrs. Anderson's vision and speech were impaired, however, most of the time her mind was alert for a person her age; she was fond of her niece, the appellant; that her closest friends were Brown and Mrs. Eastwood; and that she was close-mouthed and had a dominant personality.

Mr. Reeves, Mrs. Anderson's regular plumber, testified that she was a "sharp bargainer" and that in

the spring of 1964 she did not appear to have her usual interest in her affairs; that the signatures on her checks that she gave him in 1964 were not as legible as before. However, he testified that Mrs. Anderson knew her property and its needs.

Arcola Griffin, who did housework for Mrs. Anderson for 3 or 4 months in 1963 and the first part of 1964, testified that Mrs. Anderson's vision was impaired; that she was bedfast and required constant attention; that she signed several rent receipts for Mrs. Anderson; that the appellant visited her aunt often; that Mrs. Anderson told her she was fond of appellant and her son and that she wanted them to have everything she had.

Mattie Guinn had lived with Mrs. Anderson from 1955 until September 1963 and after that continued to visit her frequently. She testified that Mrs. Anderson was helpless and not as mentally alert since becoming partially paralyzed; that it was necessary to read the paper to her; that she assisted her in issuing rental receipts for her property; that Mrs. Eastwood and the Loftins were some of Mrs. Anderson's closest friends and that Mrs. Anderson loved her niece, the appellant. She described Mrs. Anderson as a strong-willed woman who was very conservative. Pearl Clayborn testified that she was a practical nurse with Mrs. Anderson most of the time beginning in June 1963 until the early part of 1964. She described Mrs. Anderson as being in poor condition physically and that sometimes she was mentally incapacitated. According to her, Mrs. Anderson wanted the appellant and her son to have all of her property.

There was evidence that since 1946 Mrs. Anderson had made a series of wills containing numerous bequests. In some of them, including the last one dated in March 1962, she made small bequests to appellees in comparison to the questioned gifts. There was some discrepancy in the testimony of the appellees with reference to the date the securities were removed from the

safety deposit box and the date that Mrs. Anderson signed those requiring her signature.

In the very recent case of *Stratton v. Corder*, 236 Ark. 472, 366 S. W. 2d 894, we summarized the legal requirements of a valid gift *inter vivos*. There we said: "(a) the donor at the time must have been of sound mind; (b) must have actually delivered the subject matter of the gift to the donee; (c) by such act must have intended to pass title thereto to the donee to take effect immediately; and (d) the donee must have actually accepted it as a gift." A heavier burden of proof exists where there is a confidential relationship between the donor and donee. *Young v. Barde*, 194 Ark. 416, 108 S. W. 2d 495. There we said: "***The general rule is that where special trust and confidence exists between the parties to a deed, the gift to the party holding the dominant position is *prima facie void*." See, also, *Norton v. Norton*, 227 Ark. 799, 302 S. W. 2d 78. Therefore, we closely scrutinize a gift under these circumstances and hold invalid a gift when it appears that the person in the dominant position has overreached the other. *Hickerson v. Lyon*, 229 Ark. 24, 312 S. W. 2d 930.

In the case at bar we are of the view that Mrs. Anderson was not under the dominance of any of the parties when these gifts were made. We agree with the chancellor's finding:

> "The Court finds that Mrs. Anderson, while suffering from a serious physical disability, was on the dates in question of sound mind, still exhibited the strong and dominant will which the witnesses agreed was an outstanding trait of her personality, and that she made the questioned gifts not as a result of any overreaching by the defendants but as a voluntary expression of appreciation to three favored friends, who had been faithful to her for more than twenty-five years."

Therefore, we do not agree with appellant's contention

that the trial court erred in its analysis of the acts as applied to the law governing gifts *inter vivos*.

Appellant further contends that the "dead man's statute," Schedule § 2 of the Arkansas Constitution, barred the testimony of appellees since Loftin was named and had qualified as executor of decedent's estate. The answer to this assertion is that the present action is not one by or against the executor of the estate. This action is a declaratory judgment proceeding in which Loftin is made a defendant as an individual and not in a representative capacity as executor. In fact, a special administrator was duly appointed and was serving during the pendency of this action.

Our well settled rule is that we do not reverse the findings of the chancellor unless against the preponderance of the evidence. In the case at bar we certainly cannot say that the chancellor's findings are against the preponderance of the evidence.

Affirmed.