JAMISON *v.* DUNCAN.

5-2405                                                    348 S. W. 2d 709

Opinion delivered June 5, 1961.

[Rehearing denied September 11, 1961.]

*Botts & Botts,* for appellant.

*George E. Pike,* for appellee.

*Moncrief & Moncrief,* for interveners.

JIM JOHNSON, Associate Justice. This is a controversy involving title to certain real property located in Arkansas County.

William Wright acquired legal title to the land here in controversy from his father. This land had been the family home prior to his father's death and had for a number of years prior to this controversy been the home place of William Wright and his sister, appellant Agnes Jamison. Their father had other children. These children, as well as William Wright and his sister, Agnes Jamison, had worked on the place and contributed to the support of the family and the acquisition of this 186.59 acre farm.

In 1942 William Wright and his wife sold to a niece of Wright, C. L. Wilson, 10 acres of this land and on payment of the purchase money executed and acknowledged to her a warranty deed which was recorded the same year.

In 1943 the wife of William Wright died. He thereafter continued to live on this place until taken to the home of his niece, appellee Ozella Duncan, by appellee's husband, Alf Duncan, in September 1958. In the latter years of his life, Wright's health seriously declined. Various relatives, his sister, Agnes Jamison, nieces and nephews and neighbors did errands and chores for him; housecleaning, cooking, hauled fuel-wood, etc. At times Wright's memory then appeared freakish. In September 1958, appellant Agnes Jamison, was in the home of her brother, William Wright, cooking for him, keeping house, etc., at which time she suffered a light stroke and was taken to the home of her son, the brother of appellee Ozella Duncan. Appellant Agnes Jamison (appellee Ozella Duncan's mother) appears to have had no property and had only a small welfare check. Ozella Duncan's interest in her own mother is indicated by the following testimony:

"Q. Isn't she your own mother?

"A. That's what she told me. That's all I know.

"Q. Just because she told you that? Didn't she look after you and raise you?

"A. Yes, sir, I understand she did."

Appellee Ozella Duncan's interest in her wealthier uncle, William Wright, was quite to the contrary. In early September 1958, she had her husband, Alf Duncan, pick up William Wright, who had a sizeable bank account which was in excess of $5,000 and involved lands valued at $12,000 to $15,000, and take him to a physician in DeWitt. From DeWitt he took William Wright to appellee's home where he remained until his death November 10, 1958. Not long before Wright was taken to appellee's home, he, Wright, cashed a check on his bank account for approximately $100, and while in appellee's home checks for groceries and other things were cashed on Wright's account. While in appellee's home and under Ozella's care and daily attendance, Wright's condition was such that at times he answered the calls of nature in bed. At times he did not recognize familiar acquaintances, undressed or removed his clothes in the presence of visiting women, would leave the bed and walk out when, as appellee testified, she was afraid he could not get back in the house. His condition required constant attention, all of which resulted in the trial court's holding that William Wright ". . . was suffering from a mental weakness due to old age and disease . . ."

In the last three or four days before the deed now in dispute was signed by mark, appellee, who says she was acting at the request of Wright, made three trips back and forth from her house to DeWitt, a distance of 7 miles, to get Mr. J. M. Henderson to prepare a deed for Wright to herself. On one of these trips she made to obtain Mr. Henderson to make a trip to her house, Wright was asleep and was not aroused, although she claims Wright had her to go for Henderson. During these last few days appellee says she made two trips

for a Mr. McMillan to come to her house to witness the mark of Wright and on the last trip, November 8, 1958, the mark was made on the deed conveying the entire 186.59 acres of land to Ozella Duncan while Mr. McMillan witnessed the mark, it being undisputed that prior to Wright's severe illness he had been able to sign his own name to checks and other instruments which he executed. Of this occurrence, appellee's witness McMillan on direct examination testified:

"Q. Tell the Court the circumstances under which you witnessed the deed?

"A. They asked me to go out.

"Q. Who asked you?

"A. Alf and his wife. I went out and he was in the back room in bed. He made the mark in my presence and I witnessed the mark."

As to the manner of making the mark, this witness of appellee said: "Ozella (this appellee) helped him with the pencil to make his mark."

"Q. Did he touch the pencil?

"A. Yes, sir."

This was November 8th and from the occurrence it appears that appellee in a measure acted as both grantor and grantee in the deed to her. Wright died November 10th, less than three days after the deed was marked. The deed recited that it was "in consideration that appellee give me a home, nurse and take care of me as long as I may live Dollars." The deed recited that "grantor reserves all rents and profits" and the record reflects that only a few days before the execution of the deed a tenant on the farm here in question had delivered a number of rental checks totaling in excess of $800 for rents due Wright. Appellee deposited these checks to her personal credit and account. That appellee knew Wright was at death's door is shown by her own testimony:

"Q. One reason why you deposited these checks, totaling something over $800.00, on the day your uncle made his mark, or immediately afterwards, was the reason because you wanted them deposited while he was alive?

"A. Yes, sir.

"Q. Why did you want them deposited before he died?

"A. I really don't know.

"Q. But you wanted them deposited before he died?

"A. I really did."

From what we have said above, we cannot escape the conclusion that a relationship of trust and confidence between Wright and appellee existed and that from this relationship and Wright's dependence on appellee arose a dominant influence. Appellee exercised and took advantage of this influence by making all of the arrangements and imposing her presence all during the transaction, even to the point of helping Wright with the pencil in making his mark. In effect, she helped Wright to touch the pencil used in making the mark. The conduct and acts of appellee in the circumstances surrounding this deed to land of the value of $12,000 to $15,000 speak louder and more effectively than words.

In the case of *Young* v. *Barde,* 194 Ark. 416, 108 S. W. 2d 495, we said:

"The evidence clearly establishes the most intimate and confidential relationship between appellant and Mrs. Nancy C. Hileman and her daughter, Edith Hileman. It is also undisputed that there was no consideration for the deed in money paid or service rendered. Therefore, the purported conveyance was, if anything a mere gift and, under settled rules, it was the duty of appellant to establish that the same was free and voluntary by convincing testimony. The general rule is that, where special trust and confidence exists between the parties to a deed, the gift to the party holding the domi-

nant position is prima facie void. In *Gillespie* v. *Holland,* 40 Ark. 28, 48 Am. Rep. 1, cited by appellees, the court announces the doctrine from which there has been no deviation, as follows: 'It has been the well established doctrine in equity, that contracts and most especially gifts, will be scrutinized with the most jealous care, when made between parties who occupy such a confidential relationship as to make it the duty of the person benefited by the contract or bounty to guard and protect the interests of the other and give such advice as would promote those interests. And this is not confined to cases where there is a legal control. * * * They are supposed to arise whenever there is a relation of dependence or confidence, especially that most unquestioning of all confidences which springs from affection on one side, and a trust in a reciprocal affection on the other. The cases for the application of the doctrine can not be scheduled. They pervade all social and domestic life. The application may sometimes be harsh, and one might well wish that an exception could be made, but there is a higher policy which demands that it should be universal. The language of Lord Kingsdown in *Smith* v. *Kay,* 7 H. L. Cas. 750, has been considered striking. He says that relief in equity will always be afforded against transactions in which influence has been acquired and abused, in which confidence has been reposed and betrayed.' "

Following the rule set out above, on trial *de novo* we find that appellee failed to establish by convincing testimony that the transaction between her and William Wright was free and voluntary. Accordingly, the findings of the trial court to the contrary are reversed and the cause is remanded for proceedings consistent with this opinion.

WARD and ROBINSON, JJ., dissent.