## Leonard C. DUNN *v.* Christine DUNN

73-182                                          503 S.W. 2d 168

Opinion delivered December 17, 1973
[Rehearing denied January 28, 1974.]

*Shackleford & Shackleford,* for appellant.

*Haskins, Ward & Rhodes* and *Bruce Bennett,* for appellee.

FRANK HOLT, Justice. Appellant brought this action for a divorce against the appellee and for a determination of their respective property rights. The issues were joined by appellee's counter-claim by which she also sought a divorce and adjudication of her property rights. The chancellor found that the appellant husband did not prove grounds for a divorce and "the proof falls far short of establishing fraud or deceit" on the part of the appellee wife when her husband made her joint owner of all his personal and real property; that the appellee had established her alleged grounds for divorce based upon personal indignities; that the various instruments, which included passbook savings accounts, certificates of deposit and deeds which were changed by appellant husband to create tenancies by the entirety or joint ownership, were valid; and that the trial court was not divested of jurisdiction by the appeal from the divorce decree inasmuch as the court specifically reserved jurisdiction for thirty days in order for the parties to effect an agreement between themselves as to a division of their property rights. When this was not accomplished within the specified time limit, a final order was then rendered.

For reversal appellant first contends that the court erred in upholding the validity of a revocation by Leonard (appellant) of his revocable trust and subsequent transfer of his property to the joint ownership of himself and his wife, Christine (appellee), inasmuch as a confidential relationship existed between them with Christine being the dominant party which created a presumption of coercion or fraud, which presumption Christine did not rebut with sufficient evidence that the instruments were freely and voluntarily executed. Our cases hold that where a confidential relationship exists between a donor or grantor and a dominant donee or grantee, then that donee or grantee must produce evidence to show that the instruments were freely and voluntarily executed. *Norton v. Norton,* 227 Ark. 799, 302 S.W. 2d 78 (1957), involving a mother-grantor, son-grantee relationship; *Gillespie v. Holland,* 40 Ark. 28 (1882), involving a sister-grantor,

brother-grantee relationship; *Young* v. *Barde,* 194 Ark. 416, 108 S.W. 2d 495 (1937), where the gift to the dominant daughter-grantee was referred to as prima facie void; and *Jamison* v. *Duncan,* 233 Ark. 780, 348 S.W. 2d 709 (1961), involving an aged and mentally weak uncle-grantor. Of course, the confidential relationship based on faith and repose as well as the dominant position must be supported by testimony before the presumption of coercion will arise. *Donaldson* v. *Johnson,* 235 Ark. 348, 359 S.W. 2d 810 (1962).

Leonard and Christine were married on July 31, 1971, when he was 68 and she was 47. It follows that a confidential relationship was therefore established by the marriage. Of course, it is recognized that no greater confidential relationship is known to the law than that which exists between a husband and wife. See *Gillespie* v. *Holland, supra;* 41 Am. Jur. 2d, Husband and Wife, § 272.

We now review the evidence with respect to the dominant party in this confidential relationship. In 1967 Leonard had suffered permanent brain damage from a stroke. A year later his wife died. On April 27, 1971, Leonard signed a will making numerous relatives of his and his deceased wife his beneficiaries of a substantial estate. On June 8, 1971, he executed a revocable trust to the same effect. These instruments were drafted by a Little Rock attorney after consultations with him. He was driven there from his home at Hampton by one or two of his relatives who were minor beneficiaries. During the first part of this year, he proposed marriage to three different women in the locality. Each refused his proposal. A widow testified "[H]e just didn't know and he wasn't capable of knowing what he wanted." Another woman said that the first time he came to see her he said he was "looking for a wife" and "it kinda of stunned me." This woman said he was unable to speak distinctly because of his stroke. The other woman testified that he surprised her by proposing marriage the first time she was with him and that on May 29, after several dates, she refused marriage. She also noticed he had a definite speech problem. He assured each of these women that they would never need to continue work since he was financailly well to do.

In the early part of 1971, through a mutual friend, Leonard was introduced to Christine, who had recently returned to her local community from out of state employment after several years' absence. In June, he proposed marriage to her. About the middle of July she accepted his proposal and they were married on July 31. About a month following the marriage, he told her about the revocable trust and under the terms of it she would receive nothing. Within a few days, accompanied by him, she drove to El Dorado to consult with an attorney who had previously represented her father. As a result of the conference Leonard signed shortly thereafter (September 2, 1971) a revocation of his trust agreement and then conveyed all of his real property and various savings accounts to their joint ownership. In March, 1972, they moved into a new home at nearby Tinsman, Arkansas. The construction and furnishing approximated $36,000 and were paid for by the sale of some of Leonard's timber. At the time they moved, she acquired possession of all his passbooks and certificates of deposit (totaling approximately $117,000) and kept them in her possession until this litigation arose in July, 1972, which was one year after their marriage. The week before Christine left Leonard she cashed one certificate of deposit for approximately $15,000 at Camden. She immediately drove to El Dorado and deposited $14,000 of the funds in a bank in her name.

A doctor, who treated Leonard in 1967 following his stroke, testified that he suffered permanent brain damage and as a result he became dependent and easily subjected to influence by others. A clinical psychologist examined and tested Leonard a short time before the trial and it was his opinion that his mental condition was below average; his judgment in his social affairs was in the mentally deficient range; and it would be difficult for him to function in some areas of life. Furthermore, that due to Leonard's mental deficiency he would depend on any person in whom he had trust and confidence.

The attorney who drafted his revocable trust about two months before the marriage testified that, although he appeared to have testamentary capacity, Leonard want-

ed someone to assist him in making his decisions and he indicated that he needed greater assistance in making decisions than the average client. The purpose of the trust was to prevent a "prospective wife" from getting any of his property. However, if he "got along fine" upon remarriage he wanted to cancel the trust and "take care of his wife." Other evidence was adduced by lifelong friends that before Leonard's stroke he was mentally alert and above average and since then he was an entirely different individual; that he got things "backwards;" that he refers to a man as "she" and a woman as "he;" that he was no longer talkative and had a bad memory. Leonard's relatives testified that he could not talk well and that someone had to write his rent receipts and he was unable to take care of his store and rent houses alone.

Leonard himself testified. During his testimony he referred to Christine as "him" or "he". He would also refer to a man as "she" and if he referred to a woman he used the pronoun "he" or "him." He was unable to remember the names of the various financial institutions in which he had his savings deposited. He could not recall the counties where he held real estate consisting of approximately 500 acres, other real estate and rental property. He was unable to remember his sister-in-law's name who cared for him after his stroke and assisted him in his store. He had difficulty in remembering Christine's unmarried name nor could he remember the name of his closet living relative, a sister. He was unable to give the date of his marriage to Christine and where they spent their honeymoon. When asked why he transferred his property to Christine as a joint owner, he said "I couldn't tell you that. I reckon I was doing it because Christine wanted it that way."

In our view this evidence is sufficient to establish that Christine was the dominant personality in this marriage relationship. This is true even though there was evidence that Leonard was physically able to drive a car, cultivate a garden, collect rent, hunt and cook. Since we hold that this evidence is sufficient to invoke the presumption of coercion or the instruments were not freely and voluntarily executed, the burden of producing evi-

dence shifts to the party who must rebut the presumption. The presumption of coercion is a strong one. The presumption is not a "Thayer's bubble" which bursts upon the production of any evidence of a flitting bat "disappearing in the sunshine of actual facts." *Mockowik* v. *Kansas City, St. J. & C.B.R. Co.,* 196 Mo. 550, 94 S.W. 256 (1906), quoted in McCormick, Evidence, § 345 (2nd. Ed. 1972). In *Gillespie* v. *Holland, supra,* we said:

> . . . . contracts, and most especially gifts, will be scrutinized with the most zealous care when made between parties who occupy such a confidential relation as to make it the duty of the person benefited by the contract or bounty to guard and protect the interests of the other and give such advice as would promote those interests. . . .

One scholar has written:

> Except as the court may be restrained by constitutional requirements of due process of law. . ., there would seem to be no reason in law or logic why there should not be accorded to any or all presumptions the weight which the court feels would best serve the interests of justice. If dissipation by a bare denial from an interested witness seems to accord too trifling an effect to a presumption, the court would seem justified to require more before the presumption is rebutted. Barnhart, Use of Presumptions in Arkansas, 4 Ark. L. Rev. 128, 141 (1950).

In *Ball* v. *Hail,* 196 Ark. 491, 118 S.W. 2d 668 (1938), the testimony of both the employer and the employee was held insufficient to overcome the presumption that the employee-driver was acting for his employer at the time of the accident, since both were interested witnesses.

The principal testimony, introduced to rebut the presumption of coercion or that the transactions when effected were not freely and voluntarily made, is Christine's. She testified that the property was taken out of the revocable trust and placed in their joint names following an automobile accident about a month after

their marriage. The evidence appears uncontroverted that this was the first time she knew of the antenuptial instrument precluding her from any statutory property rights. Christine testified that, as a result of the wreck, Leonard worried that she would receive nothing if he died and it was his own idea to revoke the trust and change the will to protect her. In the circumstances of this particular case, we hold that the testimony of Christine, an interested witness, was not sufficient to rebut the presumption that the transactions between her and Leonard were not freely and voluntarily made. Neither was the testimony of an abstractor, who notarized the two deeds the day following the revocation of the trust, the purchaser of the timber, nor the contractor, who constructed their new home, sufficient due to their very limited knowledge of the relationship between the parties and the conveyances. Therefore, the chancellor erred in upholding the trust revocation and property transfers.

Appellant next contends that the court erred in refusing to grant him a divorce on his complaint and that the divorce granted Christine on the counter-claim is not supported by a preponderance of the evidence. Suffice it to say that it appears that Leonard's proof of alleged indignities is absolutely uncorroborated, as is required, even though the corroboration need only be slight. *Welch* v. *Welch,* 254 Ark. 84, 491 S.W. 2d 598 (1973). Christine was granted a divorce relying also on the personal indignities provisions of Ark. Stat. Ann. § 34-1202 (Repl. 1962). Christine testified that Leonard shoved her with a crutch in the chest or throat resulting in a broken collarbone. Leonard denied the attack stating she injured herself. One witness testified that when she saw Christine in the hospital she observed a very small bruise about her collarbone. No other witness corroborated Christine's testimony about any incident or systematic mistreatment. Although only slight corroboration is required, the corroborating testimony must be directed towards specific acts and conduct and not an isolated incident. *Welch* v. *Welch, supra.* In our view neither party was entitled to a divorce.

Appellant next contends that his appeal from the April 5, 1973, decree divested the trial court of jurisdic-

tion and therefore the subsequent order on April 25, 1973, awarding an attorney's fee and a division of the property was improperly rendered. By a formal decree dated April 5, 1973, the chancellor denied Leonard a divorce, refused to void the transactions in which Christine was made a joint owner of Leonard's property and granted Christine a divorce on her cross-complaint. At the same time, the court stated that it was taking under advisement the disposition of their property rights for a period of thirty days in order to permit the parties to resolve this controversy between themselves. Further, "that in the event such property division is not agreed upon within the said thirty days, the Court will grant a hearing and determine that issue and enter an order either designating division in kind or sale of same and a division of the proceeds thereof." Leonard promptly appealed.

On April 18, 1973, being unable to effect an agreement respecting the distribution of their asserted property rights, Christine petitioned the court for a supplemental attorney's fee (a $500 temporary fee was initially awarded) and further petitioned the court that the cash assets be distributed equally and that the real property allegedly owned by Leonard and Christine jointly be appraised, sold and the assets divided equally. Also that the payment of $500 per month to each party from the impounded funds be continued. Leonard responded asserting that the court no longer had jurisdiction inasmuch as he had already appealed from the April 5 decree. On April 25, following a hearing, the chancellor decreed $5,000 as a supplemental attorney's fee, ordered the real property appraised, sold and all cash assets divided euqally, and refused a continuance of the $500 monthly payment from the impounded funds to each party. The chancellor specifically found that "no final appealable order was entered by this court on the 5th day of April, 1973, and the court does have jurisdiction . . . and IT IS FURTHER ORDERED, CONSIDERED AND ADJUDGED THAT the Decree of April 5, 1973, and this order comprise a Final Order in this case." Appellant also appealed promptly from this decree.

In *McConnell & Son, et al* v. *Saddle*, 248 Ark. 1182, 455 S.W. 2d 880 (1970), we held that a judgment, to be

final, must dismiss the parties from the court, discharge them from the action, or conclude their rights to the subject matter in controversy. There we said:

> Cases can not be tried by piecemeal, and one can not delay the final adjudication of a cause by appealing from the separate orders of the court as the cause progresses. When a final order or judgment has been entered in the court below determining the relative rights and liabilities of the respective parties, an appeal may be taken, but not before . . .

See also *Piercy* v. *Baldwin*, 205 Ark. 413, 168 S.W. 2d 1110 (1943).

Obviously in the case at bar, the chancellor was avoiding a piecemeal appeal since he limited their negotiations to thirty days which is the statutory time for an appeal. Ark. Stat. Ann. § 27-2106.1 (Repl. 1962). Well within that thirty days he adjudicated all issues between the parties. The chancellor also found that the latter order was intended to constitute the final order. In the circumstances, we find no merit in appellant's contention. Certainly no prejudicial effect is demonstrated. We affirm that part of the decree allowing the supplemental attorney's fee. Let it be remembered that the property in controversy consists of approximately $117,000 in cash assets and is in excess of 500 acres, together with other real estate, timber and rental property. In fact, the amount of the fee is not questioned on appeal.

The decree is reversed and the cause remanded for proceedings not inconsistent with this opinion. In doing so, it is without prejudice for the appellee to assert and establish any of her statutory rights as a result of this marriage, including maintenance.

Reversed in part—affirmed in part.

HARRIS, C.J., not participating.