George K. Cracraft, Judge.
 

 The guardians of the person and estate of Agnes Bauer brought this action to recover from Stanley and Anna Lucich personal property and monies alleged to have been obtained from their ward either during a period of time when she was mentally incompetent or by undue influence and duress at times when, due to advanced age and mental infirmity, she did not possess the requisite mental capacity to make valid gifts. The value of these gifts exceeded $161,000. Appellees admitted receipt of gifts beginning in 1974 and ending November 3, 1977 but denied that Ms. Bauer was incompetent, did not have the mental capacity to make gifts, or that they were obtained by undue influence. The chancellor filed an exhaustive memorandum opinion in which he made specific findings of fact. The decree dismissing the complaint for want of equity contained the following findings and conclusions:
 

 FINDINGS OF FACT
 

 1. Agnes Bauer’s mental condition was normal for a person her age and she had sufficient mental capacity to make valid gifts during the “gift period”.
 

 2. There is no substantial evidence that Stanley and Anna Lucich defrauded, coerced or took undue advantage of Agnes Bauer or otherwise exercised any undue influence and, to the contrary, all of the gifts were intelligently, deliberately and freely given.
 

 3. The relationship between Agnes Bauer and the defendants was not the sort of “confidential relationship” which raises a legal or evidentiary presumption of invalidity of gifts.
 

 CONCLUSIONS OF LAW
 

 1. The plaintiffs have failed to sustain their burden of proving that Agnes Bauer lacked sufficient mental capacity to make valid gifts during the time period involved in this lawsuit.
 

 2. The plaintiffs have failed to sustain their burden of proving that any of the gifts were obtained as a result of undue influence, fraud, duress, overreaching or by any other means condemned by the law.
 

 3. The plaintiffs have failed to sustain their burden of proving that the relationship between Agnes Bauer and Stanley and Anna Lucich was such as to raise a presumption that the gifts were obtained by abuse of that relationship or to shift the burden of proof on this point.
 

 Appellants maintain that the trial court erred in each finding and conclusion. We do not agree and address each point of reversal after a recital of those facts deemed necessary to an understanding of our decision.
 

 Agnes Bauer, a wealthy widow, was born in 1900 and had entered into three childless marriages. Her third husband, Frank Bauer, died suddenly and unexpectedly in 1974. She grieved extensively over his death. All of the witnesses testified that after his death she was lonely, frightened and depressed.
 

 Shortly after Mr. Bauer’s death James H. Gray, a stepson of her second marriage, moved into Mrs. Bauer’s home to assist her in her adjustment. He stayed only a short time, explaining that he had moved out because of her peculiar actions and the hours she kept. She then moved two houses west of her house into the home of the appellees who had been neighbors and friends for some time. Appellees changed their living arrangement, purchased additional furnishings and installed additional doors in order to provide Mrs. Bauer a private bedroom and bath. For months she spent nights in appellees’ home, returning to her own house during the day. Monsignor James E. O’Connell who had been living in appellees’ home for seven years continued to reside there during this period. Monsignor O’Connell had been a close friend of both Mr. and Mrs. Bauer for over twenty years and had known Mrs. Bauer since the 1930’s when she resided in Fordyce during her first marriage.
 

 The friendship and association which Mr. and Mrs. Bauer had maintained with appellees continued to grow after his death. For the first year or more after the death of Frank Bauer, Stanley Lucich spent a great deal of time helping Mrs. Bauer get her affairs in order and trying to get her to relax and get her mind on other things. She would bring these problems to him or send for him. He testified that he suggested the custodial and trust arrangements with Union National Bank in order to achieve that result. Thereafter all her financial matters were handled by the bank and most of her bills sent to its trust officer, Henry E. McCord. Appellee’s advice to her thereafter was limited to explanations of those communications from the bank which he could understand but she could not. All other questions were referred to Mr. McCord.
 

 Mrs. Bauer was left with two Cadillac automobiles and offered one as a gift to Stanley Lucich who had evidenced kindness and attention to her from the time she had moved into the neighborhood. He selected the older one. In 1976 he traded that car for a new one and financed the balance of some $7,000. When Mrs. Bauer learned of the transaction she paid the trade-in difference as a gift over his protest.
 

 From the gift of the used Cadillac to the 7th day of November, 1977, Mrs. Bauer, with ever increasing frequency, gave to the Luciches at least eighty-six separate gifts of clothing, furs, jewelry, silver, china and money, amounting, in the aggregate, to a sum in excess of $161,000. The largest of these gifts was a cashier’s check for $25,000 given to the Luciches in July 1976 at a time when it was contemplated that they would purchase a lot next door to Mrs. Bauer and build a home on it. Both Mr. and Mrs. Lucich testified that the gifts were received over their protestation, a fact which was corroborated as to many of those gifts by Monsignor O’Connell who was present when they were received.
 

 In support of the allegation of mental infirmity and incapacity, the appellants offered lay testimony that in 1974, immediately after the death of Frank Bauer, Mrs. Bauer became extremely nervous, depressed, forgetful, disoriented, repetitious and unable to properly identify persons and relatives. They stated that she referred on several occasions to her deceased husband and other relatives as still living. It was their testimony that this condition existed as early as 1974 and worsened continuously until the present time.
 

 Gaston Williamson, a prominent Little Rock attorney and witness for appellants, testified that Mrs. Bauer made changes in her will in 1974 and again in 1975. He said that at those times she was fully competent and had the mental capacity to execute the instruments. In 1974 she executed a custodial agreement with Union National Bank of Little Rock under which the bank would act as her agent in collecting all dividends and interest on her securities and investments and place them in her checking account. In August of 1976 Mrs. Bauer executed a revocable trust agreement, transferring all of her assets, including title to her home, to Union National Bank for her use and benefit during her lifetime, with remainder to her nieces and nephews after her death. Mr. Williamson, the drafter of the trust agreement, and Mr. McCord, trust officer of the bank, both of whom were present when it was discussed and executed, each testified that she was mentally competent to execute the instrument.
 

 At the time the trust agreement was executed Mrs. Bauer had already made substantial gifts totalling approximately $50,000 to the Luciches. A month prior to that date Mr. McCord had delivered to Mrs. Bauer a cashier’s check for $25,000 which she had told him she was giving to the Luciches as a gift. Mr. McCord testified that he had ascertained that there had been no coercion by the Luciches. He stated that Mrs. Bauer had led him to understand that the Luciches’ friendship had been “important to her and they had been helpful to her. I had no doubt in my mind that she was telling the truth about that.”
 

 A year later in August, 1977 Mr. McCord noticed overdrafts in Mrs. Bauer’s accounts and called her about them. He testified that she stated she didn’t remember executing the checks which caused the overdrafts. He stated that during this time she would call him several times on the same day inquiring about her bank balances. Concerned by these actions, he invited her to lunch with him and his superior. Both officers of the bank testified that during lunch she was extremely nervous and repetitious.
 

 As a result of their observations McCord and Williamson, the bank’s attorney, called on Mrs. Bauer to discuss these overdrafts with her. They testified that she at first denied writing one of the checks payable to appellees and then recalled it, and that she did not recall writing the other two checks which they questioned. Both concluded then that she was incapacitated and that a guardianship would be required. Steps to initiate guardianship proceedings were taken immediately.
 

 Dr. Alfred Kahn, Jr., Mrs. Bauer’s personal physician since 1955, was requested to execute a medical affidavit affirming her incompetency. Dr. Kahn was hesitant to do so. He wanted to go to court, “state what her medical history was and let the j udge make his own determination regarding her competency.” He was informed that the probate judge would prefer a medical opinion, and upon assurance that her heirs would not sue him, Dr. Kahn “reluctantly” executed the affidavit. The guardians were appointed on November 7,1977. No gifts to appellees were made after that date.
 

 Dr. Kahn testified that he had been Mrs. Bauer’s physician since 1955. In 1974 in conducting a two day examination for neck pains, he found her to be “reasonably vigorous for a person seventy years of age.” In October of 1975 his examination report reflected “she stated her health was stable but she had been emotionally upset at the death of her husband.” At that time Dr. Kahn noted nothing suggesting neurological disease. Her memory seemed to be intact. He felt that there were some changes “which occur with aging in the brain” which he felt was the cause of her depression. He prescribed medication to increase blood flow.
 

 He saw her again on September 19, 1977 “for intermittent rectal bleeding.” At that time he noted some “decrease in mentation,” meaning that her mental processes were slowing down and she was somewhat forgetful. He observed nothing descriptive of incapacity.
 

 Dr. Kahn saw her again in February of 1978 after the guardian was appointed. At that time he noted no change in her mental process. On April 11, 1979 he saw her and noted marked deterioration. He concluded that “Sometime between September 1977 and April 1979 she became incompetent, but I cannot give you an exact date.”
 

 Dr. Alma Faye Houston, a psychiatrist who had not seen Mrs. Bauer, stated that she read Dr. Kahn’s medical reports and the deposition of James H. Gray as to Mrs. Bauer’s actions, nervousness and forgetfulness. She opined that Mrs. Bauer had been in a weakened mental state from as early as 1974 and that such a person is “more easily manipulated than others.” Decreased mentation and forgetfulness are not descriptive of incompetency and she found no description of incompetency in these documents until Mrs. Bauer was declared incompetent in November of 1977. “I think you could say she became more and more disoriented and confused to where she was incompetent . . . going on the basis of Dr. Kahn’s records.” Dr. Travis Tunnell, a clinical psychologist associated with Dr. Houston, agreed with her analysis.
 

 The appellees offered the testimony of a large number of Mrs. Bauer’s close neighbors, friends and servants who saw her on an almost daily basis. Others of Mrs. Bauer’s friends of many years’ standing who saw her frequently also testified. None noticed any indication of incompetency or undue influence during the period in issue. Most of them had some knowledge of the gifts in question from Mrs. Bauer herself and some had even been present when the gifts were presented or discussed by Mrs. Bauer. Though they were not aware of the extent of the gifts given appellees, based on their knowledge of the relationship and the characteristic generosity of Mrs. Bauer, they were not shocked that these gifts totalled such a large amount.
 

 All witnesses were in complete agreement that there was a very close and friendly association between Mrs. Bauer and the appellee?. All agreed that the appellees were most solicitous of her, giving up a lot of their own life to see that she was cared for and her emotional needs met, taking her whenever and wherever she wanted to go. Some witnesses referred to the relationship as “mutual adoration” and a “loving relationship.” Most witnesses agreed that this developed because Mrs. Bauer was lonely and Mrs. Lucich was a kind person. Monsignor Francix X Murphy testified that he had known both donor and donees for many years. He described the relationship as “two women who had great respect for each other . . . [TJhey both showed empathy toward each other and Anna would do anything she could to make Agnes’ life more pleasant. She went out of her way to be helpful to Agnes. . . . Before the guardianship Agnes was very clear, very sharp and knew what she was doing —there was no indication that she did not know what she was doing before the guardianship.” Monsignor O’Connell described it as a very close and friendly relationship which evidenced much concern and care on the part of each for the other. He testified as follows:
 

 I knew at the time she was arranging to make a gift of $25,000 to Anna and Stanley Lucich. In my opinion at the time she was mentally competent and did not demonstrate to me any lack of knowledge of what she was doing. She demonstrated to me that she was doing it of her own free will and there was no question in my mind about it. It did not surprise me in the least the way she was doing this because she wished to demonstrate her affection for Anna in some way, in my opinion, to express appreciation for all the things Anna had done for her. Anna had been very kind to her indeed.
 

 During the entire time that I have known Agnes Bauer and up until the time the guardian was appointed for her she did not ever give any indication to me that she was mentally incompetent.
 

 I have been present when Mrs. Bauer had made gifts to Mrs. Lucich. On many occasions the gifts would have been made and then she would tell me about it in their presence. The one particular one that I mentioned in the deposition that I made was a diamond necklace and a set of earrings, a matching set. Agnes came in with the box wrapped and opened it up in the presence of Anna and me ... .In view of my presence at the time and my knowledge of the circumstances, in no way was the gift solicited. I have never known an occasion in which Anna or Stan solicited a gift from Agnes.
 

 Monsignor O’Connell himself had been the object of her bounty on three occasions. She had given him a set of golf clubs, paid a balance in excess of $4,000 owed on his automobile and had given him a check for $50,000 which he told her he would not accept. She insisted that he retain the check, which he never cashed. He stated that he did not accept this gift because she had earlier expressed a desire to make a gift of $100,000 to Christ the King Catholic Church. He felt it improper to accept the gift for some other purpose and was hopeful that she would make the larger gift later.
 

 Dr. David Miles, a neurologist who resided in Mrs. Bauer’s neighborhood and saw her on frequent visits during the period in issue, observed no indication of mental weakness or incompetence. He stated that during his observation of the relationship between the parties he “did not see at any time any indication that Mrs. Lucich was trying to take advantage of Mrs. Bauer. I had knowledge of many kindnesses of Mrs. Lucich to Mrs. Bauer.” He described Mrs. Lucich as “a very kind, warm and helpful individual... that thinks primarily of other people before she thinks of herself.” He described Mrs. Bauer as “a very outgoing person, very friendly. She was accustomed to having things going her own way, the way she liked for them to go. She was a very friendly, cordial individual but she was a strong-minded person.” There was no evidence that Mrs. Bauer was not a strong-willed, determined person.
 

 Most of the witnesses characterized her as “very generous,” and none noticed any change in that characteristic during the period in issue. Almost all of the witnesses had at one time or another been the object of her generosity. She was known to give substantial gifts to relatives, friends, employees and even to those she did not know but whose need was made known to her. One acquaintance of over forty years stated that she was “embarrassingly generous and never accepted a favor or invitation without making a corresponding gift. Any time Agnes was a guest she came bearing gifts. I think she equated loving and giving in the same term. It was difficult to refuse her any of the things she offered.”
 

 There was testimony from her relatives corroborating this generosity. It was shown that she had purchased automobiles for nephews, made gifts to several of them as down payments on homes, checks in the amount of $3,000 to three children of one of her relatives and smaller gifts on a regular basis. It was testified that she had paid $2500 on the funeral expense of one sister and had in the early 1950’s begun a monthly gift of $300 to her other sister and $100 a month to one of the nephews. There was also testimony that she had made a $5,000 business loan to one of her stepchildren and subsequently forgave repayment.
 

 The appellees testified that each of the gifts was given freely and voluntarily, not only without solicitation, but in spite of their protest, and that each time Mrs. Bauer was mentally alert and knew what she was doing. The trial court candidly stated that due to the inconsistencies in the statements of the appellees that his conclusions were not based upon their testimony except where it was corroborated by other testimony.
 

 It would unduly lengthen this opinion to attempt to recite all of the testimony heard by the court during this five day hearing. This recital is intended merely as a brief resume to point out the conflicts and general tendency of the testimony on which the chancellor based his decision.
 

 The law governing the validity of gifts inter vivos is well settled. The donor must be of sound mind, must actually deliver the gift with the intention to vest immediate title, and the gift must be accepted by the donee. The delivery with that intention must be done freely and voluntarily without undue influence and duress/Ordinarily the burden is upon one who attacks such a gift to prove that the donor lacked the capacity to give the gift or was unduly influenced. A different burden of proof arises when it is shown that a confidential relationship existed between the donor and a dominant donee. Where special trust or confidence has been shown, a gift to the dominant party is presumed to be void. The burden then rests upon the dominant recipient to show that he has not overreached the giver. Gillespie v. Holland, 40 Ark. 28 (1892); Young v. Barde, 194 Ark. 416, 108 S.W.2d 495 (1937); Norton v. Norton, 227 Ark. 799, 302 S.W.2d 78 (1957); Jamison v. Duncan, 233 Ark. 780, 348 S.W.2d 709 (1961); Donaldson v. Johnson, 235 Ark. 348, 359 S.W.2d 810 (1962); Barrineau v. Brown, 240 Ark. 599, 401 S.W.2d 30 (1966); Dunn v. Dunn, 255 Ark. 764, 503 S.W.2d 168 (1973).
 

 It is also well settled that although chancery cases are reviewed de novo on the record we do not reverse a decree unless the chancellor’s findings are clearly against a preponderance of the evidence. Since the question of preponderance turns heavily on the credibility of the witnesses, we defer to the superior position of the chancellor in this regard. Andres v. Andres, 1 Ark. App. 75, 613 S.W.2d 409 (1981); Rule 52 (a), Arkansas Rules of Civil Procedure.
 

 The appellants first contend that the trial court erred in holding that Agnes Bauer was mentally competent during the period in issue and that the evidence did not establish a discernable date on which she lacked capacity to make valid gifts.
 

 The chancellor concluded that there was no basis for a finding of incompetency prior to August of 1976 on which date she executed the trust agreement with Union National Bank. All witnesses agreed that she was capable of executing it and had the mental capacity to do so. There was lay testimony that she was incompetent and incapacitated in September 1977 when her lawyer and banker discussed overdrafts with her. There was contradicting lay testimony, corroborated by Dr. Miles, that she was mentally competent to make a valid gift even after the guardianship was established in November, 1977. Dr. Kahn testified that she was not incompetent in September 1977 when he examined her and that she became incompetent on some date “after September 1977 and before April 1979.” He could not fix the date. On the conflicting evidence we cannot say that the findings of the trial court were clearly erroneous or clearly against a preponderance of the evidence.
 

 Appellants next maintain that the chancellor erred in holding that the relationship between these parties was not of such a character as would raise a presumption of invalidity and that he improperly placed the burden of proving undue influence on appellants. They argue that the clearly established relationship of close affection and repose was sufficient to make the gifts prima facie void and the burden of showing the contrary was upon appellees. We agree that the evidence does establish a very close relationship based on mutual affection and that relationships of friendship may be properly classed as “confidential.”
 

 In Gillespie v. Holland, supra, Young v. Barde, supra, Norton v. Norton, supra, the court stated that such relationships are not limited to legal control but are supposed to arise “whenever there is a relation of dependence or confidence; especially that most unquestioning of all confidences which springs from affection on one side and a trust in reciprocal affection on the other.” While a close friendship based on mutual affection may be deemed a confidential relationship, we find no error in the chancellor’s finding and conclusion that this relationship, standing alone, was insufficient to raise the presumption of invalidity.
 

 It is not the mere existence of a relationship of confidence which causes the gift to be deemed prima facie void. It is only when the testimony further shows that the donee occupied such a superior position of dominance or advantage as would imply a dominating influence over his donor that this presumption arises. Donaldson v. Johnson, supra. In Dunn v. Dunn, supra, in discussing the application of this rule in earlier cases the court declared:
 

 Of course, the confidential relationship based on faith and repose as well as the dominant position must be supported by testimony before the presumption of coercion will arise. (Emphasis supplied)
 

 In Gillespie, Young, Norton and Jamison where the court found both confidential relationships and dominant donees the presumption was indulged. In Barrineau, Donaldson and Dunn where the confidence was clearly established but it was not shown that the donee occupied a position of dominance in the relationship, the presumption was found inapplicable.
 

 We find no evidence, and none has been pointed out to us, which would lead to the conclusion that the appellees occupied a position of dominance in the relationship. To the contrary there is an abundance of testimony that Mrs. Bauer was a strong-willed and dominant person who wanted things to go her way and that it was extremely difficult to refuse any gifts she offered.
 

 The chancellor in his conclusions made the following observations:
 

 The many hours of thought I have given to this problem leads me to a conclusion I cannot resist. Agnes Bauer was wealthy and knew it. She was growing old and knew it. When Frank Bauer died she faced the stark reality that she had no one on this earth that seemed to really love her enough to give her the care and attention she craved and whom she could rely on to take care of her in the event she became incompetent. She was lonely, frightened and depressed and had no one to turn to. She could buy diamonds, Cadillacs, furs and the things her heart desired, and not deplete her assets (which were in safe hands in the Union National Bank), and yet all of her wealth had brought her to the last stage in life with no one else she could say generally loved her enough to do these things for her and would really attend to her welfare when she needed it — all she had to look forward to were hired hands whom she did not want.
 

 Into this picture entered the Luciches. They demonstrated to her that they would attend to her needs night and day, they were willing to, and did abandon their way of life and subject their time and attention to her wishes, and were her willing, pleasant and obedient companions. While I think the Luciches in a sense occupied a relation of confidence to Agnes Bauer, I do not think it is that kind of relationship contemplated in law that warrants interference in planned, deliberate sane acts of a 74-77 year old person. The Luciches were good, close friends of Agnes Bauer. She found she could rely upon them to give her loving care and attention at all times. At that point in life and conscious of the kind of help she would need in the not too distant future, I conclude that she intelligently decided to buy, in the guise of gifts, that love and care and attention she craved ... [I]t may sound sordid, to suggest that love, care and attention is to be put on a monetary basis, but I do not think this is unusual for wealthy, childless, septuagenerians; and it may be that some may conclude that it was a bad deal for Agnes Bauer, or immoral, or anti-social, or even evil, but once it is found that the donor is competent and acted with full knowledge and without undue restraint or fraud, the result of the act is not the concern of the law. The motive of the donor, whether virtuous or not, is not the interest of the law except as an explanation in a search for the truth. All that is needed is that the gift be the free and voluntary act of á mind having proper capacity. With the morals or justice of such gifts the court cannot deal. (Emphasis supplied)
 

 The chancellor found that Mrs. Bauer had the mental capacity to give the gifts, gave them freely and voluntarily and not as the result of the dominance of appellees. We cannot say that these findings are clearly erroneous or that he did not apply the proper burden of proof.
 

 Affirmed.