Larry Dean YOUNG  *v.*  Debra Loraine YOUNG

CA 07-540                                                         278 S.W.3d 603

Court of Appeals of Arkansas
Opinion delivered March 5, 2008

*Brenda Austin Ltd.*, by: *Brenda Austin*, for appellant.

*Judith Rebecca Pratt Hass*, for appellee.

SARAH J. HEFFLEY, Judge. This appeal arises out of the divorce between appellant Larry Dean Young and appellee Debra Loraine Young. In distributing the parties' property, the trial court found that appellant occupied a position of trust and dominance over appellee and that he exercised undue influence over her when she executed a deed creating a tenancy by the entirety in property she received from her father. Based on these findings, the trial court set aside the deed and declared the land to be appellee's sole and separate property. The trial court also made an unequal division of marital property by awarding appellee the marital home that was built on the land. Appellant challenges both of these decisions on appeal, but finding no error, we affirm.

## The Deed

The parties in this case had been married for seventeen years until April 2006 when they separated and appellee filed for divorce. They both had been married once before, and they each had two children from their previous marriages. The four children resided with them until reaching adulthood.

In the summer of 2003, appellee's father was suffering from Alzheimer's disease and required around-the-clock care. Although employed full-time, appellee tended to her father on a daily basis, sometimes before work or during lunch, and she prepared his dinner almost every night. Her father's property had been in trust, and in June 2003 appellee received a conveyance of sixty acres of land from the trust, titled solely in her name.

In July 2003, appellee's son Cody died quite unexpectedly. Initially, the cause of death was a mystery, and because of his young age, either suicide or foul play was suspected. It was several months before the autopsy results were received, which revealed that he had died of an undiagnosed heart condition.

In August 2003, the month after her son died, appellee executed a quitclaim deed adding appellant's name to the deed. Appellee's father passed away the following November.

At the trial, appellee's first witness was her personal physician, Dr. Jennifer Bingham, who specialized in internal medicine. Dr. Bingham had treated appellee since 2000 for the chronic conditions of hypertension and Crohn's disease. Dr. Bingham explained that Crohn's disease involves the inflammation of the colon, and she said that this condition was exacerbated by stress.

Normally, Dr. Bingham saw appellee every three months, but in the summer of 2003 she had appellee come into the office every two weeks because she was worried about her. Dr. Bingham was aware of Cody's death and the illness of appellee's father. She also knew that appellee had marital problems stemming from a previous affair appellant had with another woman. Dr. Bingham stated that appellee was experiencing multiple flare-ups of her Crohn's disease and episodes of infections such as sinusitis and bronchitis, which Dr. Bingham attributed to decreased resistance from stress. Dr. Bingham also treated appellant for depression that summer.

Dr. Bingham testified that appellee was "devastated," "distraught," and "overwhelmed" with grief over the death of her son. Dr. Bingham added that appellee was "not thinking right" and that her ability to conduct the affairs of daily life was "extremely compromised." Appellee was not able to participate in making sound health-care decisions, as shown by her declining to fill prescriptions that Dr. Bingham had prescribed. Dr. Bingham said this was uncharacteristic of appellee, who usually complied with her medical recommendations.

Appellee spoke to Dr. Bingham about the land transaction. Dr. Bingham testified that appellee was feeling very much alone in the aftermath of Cody's death and in the midst of her father's illness. Appellee told her that appellant had threatened to leave her unless his name was added to the deed, and she said that appellee felt "completely forced" into doing it, and that appellee felt "awful" for having done so. Dr. Bingham testified as to her belief that appellee would not have given appellant an interest in the property had she not been so ill and "swimming in grief." She said that appellee's resistance was at a low ebb because every bit of her strength and endurance had been drained from dealing with Cody's death, her father's sickness, and her own illnesses. Dr. Bingham also testified that, based on her numerous conversations with appellee, appellant was the dominant figure in the marriage.

The trial court also heard the testimony of appellee's friend and coworker, Nora Hall. She had known appellee for nineteen years since appellee began working at the company. Ms. Hall said that the summer of 2003 was a difficult time for appellee because of Cody's death and her father's declining health. She testified that appellee was worried about her father and that caring for him took up a lot of her time and energy. Ms. Hall said that Cody's death "wiped her out" and that appellee was so depressed that she "was just like a zombie." Appellee missed a lot of work, and her work

decreased in quality. Ms. Hall explained that appellee and Cody had been very close and that they had spoken to one another on the phone every day. She stated that Cody was appellee's "support system," and whereas appellee was estranged from her daughter, Cody had always been there for appellee and loved her unconditionally.

Ms. Hall was of the opinion that appellant dominated appellee. She testified that appellant was very jealous and that he called appellee at work five or six times a day and checked the parking lot to see if appellee's car had been moved at lunch. She said that appellee was always aware of where she stood in a room in relation to male coworkers and that appellee was afraid to be seen in a car with a male coworker when they went to lunch as a group. Appellant would not allow appellee to go to a bar that he frequented that was across the street from their work. Ms. Hall also testified that appellee had to ask appellant for permission to go on trips with the girls and that before any trip appellee would be nervous and agitated to the point of physical illness because of appellant's warnings about what appellee could and could not do during the outing.

During Ms. Hall's testimony several photographs she had taken of appellee were introduced into evidence. These photographs showed extensive bruising on appellee's arms, which appellee said had been inflicted by appellant.

Gene George, part owner of the company where appellee worked, echoed the previous witnesses' testimony that appellee was despondent and not herself in the summer of 2003. He said that appellee was not functioning at her usual level and that he had been worried about her.

Appellee testified that she was devastated by Cody's death. She referred to him as her "rock" and said that they were very close. After his death, she said she "functioned like in a fog." She had trouble remembering her activities at the end of the day. She said that she was exhausted both mentally and physically.

Appellee further testified that appellant had caused the bruises shown in the photographs that Ms. Hall had taken and that there were other times he had been physically abusive. She said that on occasion she would be angry when appellant came home late and that she would try to get out of bed, but that appellant would hold her down and not let her get up. She said that appellant drank alcohol and that the more he drank the more verbally

abusive he would be. She feared him on these occasions. She said there were nights when he did not come home and other nights when someone had to drive him home. Appellee also testified that when appellant moved out of the house he took and pawned a rifle that had belonged to Cody, in her mind, just to be mean.

Appellee stated that appellant initiated all of the conversations about placing his name on the deed. She said that he called her about it at work and at night and that he would bring it up if he were at home. He threatened to leave her "just like Cody" and said that "his family was his" and that she would be deprived of them, too. She said that appellant would cuss and get extremely angry and that he called her a "greedy bitch" for not putting his name on the deed. She said that he made her "life a living hell" and that finally he "wore me down." She testified that she did not take the deed to be filed in hopes that appellant would back off. She said she did not tell her friends about it because she knew it was something she had not wanted to do. Appellee testified that there was not a day that she did not regret doing it. She said that no one at the bank told her that having appellant's name on the deed was a condition for obtaining a loan at the bank to build a home.

Sandra Thomas, appellant's sister, testified that she had never noticed any hostility between appellant and appellee and that she had not noticed appellant dominating appellee. She said that appellee was devastated by Cody's death "like any mother would be."

Appellant testified that he had not been physically or verbally abusive to appellee. He admitted that he had caused the bruises shown in the photographs, but he said that it happened one night when appellee was applying a TENS unit to his neck and he had grabbed her when she, as a joke, was going to place the unit on his genitals. Appellant also testified that he had taken and pawned Cody's rifle, but he claimed that appellee had given the rifle to his son. He did purchase and return the rifle.

Appellant did not recall any of the conversations about having his name placed on the deed. He also did not know whose idea it was to have his name placed on the deed. He said that it was not a big deal and that appellee never refused to put the land in his name. Appellant stated that they had been "married for seventeen years and it's just ours." He believed that she had placed his name on the deed because he was her husband and she loved him. He also said that a bank officer had told him that it was necessary for his

name to be on the title so that they could get a construction loan to build the home on the land. Appellant said that he had taken the deed to be filed.

Appellant's daughter, Alisha Fogley, testified that she had never witnessed any physical abuse. She said that her father had treated all of the children the same and that appellant was upset when Cody died. Ms. Fogley also testified that appellee told her that she had gotten the bruises when they were playing around with an electrolysis machine and appellee attempted to place the machine on his "male area."

In rebuttal, appellee testified that she and appellant did tussle over the TENS unit. She said, however, that the TENS unit incident occurred months before appellant inflicted the bruises depicted in the photographs.

After the trial judge heard the testimony, he took a brief recess before announcing his decision. When he returned to the courtroom, the trial judge made extensive findings from the bench. The judge found credible and placed great weight on the testimony of appellee and her witnesses. The trial judge found that appellant was the dominating force in the marriage, both physically and mentally, and that he overcame her free will at a time when she was vulnerable and in a substantially impaired state. Based on these essential findings, the trial court set aside the quitclaim deed. Appellant contends that the trial court's findings are clearly erroneous. We disagree.

When property is placed in the names of a husband and wife, a presumption arises that they own the property as tenants by the entirety. *Dunavent v. Dunavent,* 66 Ark. App. 1, 986 S.W.2d 880 (1999). This presumption can be overcome only by clear and convincing evidence that a spouse did not intend a gift. *Id.*

It is also well settled that, once a spouse has shown that a confidential relationship existed with the other, and that the other was the dominant party in the relationship, it is presumed that a transfer of property from the former to the latter was invalid due to coercion and undue influence. *Myrick v. Myrick,* 339 Ark. 1, 2 S.W.3d 60 (1999). *See also, e.g., Marshall v. Marshall,* 271 Ark. 116, 607 S.W.2d 90 (1980); *Dunn v. Dunn,* 255 Ark. 764, 503 S.W.2d 168 (1973); *Lyons v. Lyons,* 13 Ark. App. 63, 679 S.W.2d 811 (1984); *Perrin v. Perrin,* 9 Ark. App. 170, 656 S.W.2d 245 (1983); *Crestman v. Crestman,* 4 Ark. App. 281, 630 S.W.2d 60 (1982). In such a case, the spouse to whom the property was transferred bears

the burden of rebutting the presumption by producing evidence showing that the transfer of property was freely and voluntarily executed. *Myrick, supra.* The invocation of the presumption of invalidity is in truth the product of a two-pronged test. *Id.* Before the presumption of invalidity can be invoked, the transferring party must not only claim that the receiving party was the dominant one, but must also establish that this party occupied such a superior position of dominance or advantage as would imply a dominating influence. *Id.* Once this has been established, the presumption of involuntariness on the part of the transferring spouse is invoked, and the burden shifts to the donee to prove that the transfer was voluntary. *Id.*

Although we review traditional equity cases de novo on the record, we do not reverse unless we determine that the trial court's findings were clearly erroneous. *Hill v. Hill,* 84 Ark. App. 132, 134 S.W.3d 6 (2003). A trial court's findings of fact are clearly erroneous when, although there is evidence to support them, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Id.* In reviewing a trial court's findings, we defer to the trial court's superior position to determine the credibility of witnesses and the weight to be accorded their testimony. *Id.*

In this case, appellee ostensibly made a gift of this property to appellant, but there was evidence credited by the trial court that it was one that was not bestowed upon him voluntarily. The record contains testimony that appellant commanded a dominating influence over appellee. There was also evidence that he badgered, belittled, and threatened appellee to accede to his demand for an interest in the property at a time when she was in a substantially weakened and diminished condition, both physically and emotionally. We are simply unable to say that the trial court's findings or its decision was clearly erroneous.[1]

---

[1] Appellant has raised no claim of laches occasioned by the three-year lapse of time between the transfer and the request to set it aside made in the divorce action. Nor does he argue that this time interval detracts from appellee's claim of undue influence. Our review of the case law does not reveal any time restraints for seeking to set aside a transaction that was not freely made. *See, e.g., Myrick, infra* (fourteen-year lapse); *Marshall v. Marshall, infra* (two-year lapse); *Dunn v. Dunn, infra* (one-year lapse); *Perrin v. Perrin, infra* (two-year lapse).

### Unequal Division of Marital Property

The trial court evenly divided the parties' marital property except for the marital home. The court awarded appellee the home and also made her responsible for paying the construction loan. Arkansas Code Annotated section 9-12-315(a)(1)(A) (Repl. 2008) contains a non-exclusive list of factors for a trial court to take into account when deciding whether to make an unequal division of marital property. When an unequal division is made, the statute requires that the trial court "must state its basis and reasons for not dividing the marital property equally between the parties, and the basis and reasons should be recited in the order entered in the matter." Ark. Code Ann. § 9-12-315(a)(1)(B). The trial court's order stated, "That the Court, taking into account all the factors of section 9-12-315(a)(1)(A) of the Arkansas Code, finds that an unequal distribution of marital assets to be equitable in this matter." Appellant contends that this statement falls short of the statutory requirement for the court to explain its decision.

Appellant is correct that simply reciting the statutory factors does not satisfy the requirement of the statute. *See Baxley v. Baxley,* 86 Ark. App. 200, 167 S.W.3d 158 (2004). However, the trial court covered this issue in detail in its oral ruling from the bench. We have held that a trial court's explanation set out in an oral ruling meets the requirement of the statute. *Jones v. Jones,* 17 Ark. App. 144, 705 S.W.2d 447 (1986). Accordingly, we find no merit in appellant's argument.

Affirmed.

GLADWIN, J., agrees.

ROBBINS, J., concurs.

JOHN B. ROBBINS, Judge, concurring. I disagree with the majority's holding with regard to the trial court's decision to set aside the deed. The proof showed that virtually everything each party had acquired was commingled throughout their seventeen-year marriage, which included $97,000 of appellant's Wal-Mart Stock, appellant's inheritance of $18,000, and monthly social security benefits he received after the death of his children's mother. The real property acquired by the appellee was also among the property placed into the joint ownership of the parties, and in my view the trial court clearly erred in finding that the appellant occupied such a superior position of dominance or advantage as would imply a dominating influence and raise the presumption of an invalid transfer.

While I believe the belt is broken, the suspenders hold and save the trial court's decision. I agree to affirm this case on the alternate basis recited in the trial court's order. The trial court's order stated, "That the court, taking into account all the factors of section 9-12-315(a)(1)(A) of the Arkansas Code, finds that an unequal division of marital assets to be equitable in this matter." The majority correctly points out that while simply reciting the statutory factors is not sufficient to support an unequal distribution, the trial court in this case extensively covered the proof as it related to the factors in its oral ruling from the bench. Under our holding in *Jones v. Jones*, 17 Ark. App. 144, 705 S.W.2d 447 (1986), this was sufficient. In its oral ruling, the trial court adequately explained its reasons for awarding Ms. Scott the property, and in particular noted that the real estate was acquired relatively recently by Ms. Scott through her father's trust, and that Ms. Scott would be solely responsible for the debt incurred to build the house. The trial court provided specific reasons to support an unequal distribution, and because that decision was not clearly erroneous, I concur in the majority's affirmance of this case.